# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 1, 2011

## STATE OF TENNESSEE v. CURTIS HARPER

**Appeal from the Criminal Court for Shelby County**
**No. 08-06012      James M. Lammey, Jr., Judge**

---

**No. W2011-00371-CCA-R3-CD  - Filed August 29, 2012**

---

The Defendant, Curtis Harper, was found guilty by a Shelby County Criminal Court jury of attempt to commit second degree murder, a Class B felony, employing a firearm during the commission of a felony, a Class C felony, and two counts of aggravated assault, a Class C felony.  See T.C.A. §§ 39-13-210(a)(1) (2010), 39-12-101(a) (2010), 39-17-1324 (Supp. 2008) (amended 2009), 39-13-102(a)(1)(A) (2006) (amended 2009, 2010, 2011).  The trial court merged the aggravated assault convictions into the attempted second degree murder conviction, and sentenced the Defendant as a Range I, standard offender to twelve years' confinement for attempted second degree murder and six years for employing a firearm during the commission of a felony.  The trial court ordered the sentences to be served consecutively, for an effective eighteen-year sentence.  On appeal, the Defendant contends that the evidence is insufficient to support his conviction for attempted second degree murder.  We affirm the Defendant's convictions, but we vacate the aggravated assault and attempted second degree murder judgments and remand the case for entry of a corrected judgment reflecting the merger of the aggravated assault convictions into the conviction for attempted second degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Vacated;
Case Remanded.**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Harry E. Sayle, III (on appeal), and J.T. Harris (at trial), Memphis, Tennessee, for the appellant, Curtis Harper.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to an altercation in which the Defendant repeatedly shot Antwan Boyland. Erica Beloch testified that in March 2008, she lived in an apartment on Corning Avenue in Memphis and that the victim was one of her neighbors. She said the victim lived with his girlfriend and their children. On March 14, 2008, she was at her brother's apartment one floor above her floor, and heard a "knocking" noise. Her brother identified the noise as a gunshot, and they ran outside and saw the blood-covered victim lying in the grass. She did not see a weapon in the victim's hand or the person who shot the victim. She said that she did not notice any quarrels or problems between the victim and his girlfriend and that she never saw any injuries on either of them. She did not know if the police had ever been called to the victim's apartment.

On cross-examination, Ms. Beloch testified that although she heard loud noises, she did not know they were gunshots. She went outside about three or four minutes after hearing the noise. On redirect examination, Ms. Beloch testified that although she did not count the number of noises she heard, she heard many "boom[s]."

Courtney Beloch testified that in March 2008, he lived in the apartment above the victim. On March 14, he was at home with his sister when he heard about five gunshots. He said he could distinguish between the sound of a door being kicked in and the sound of a gunshot. He did not hear a door being kicked in or any other indication of a disturbance before he heard the gunshots. He went outside and saw the victim lying in the grass bleeding. He could not tell how many times the victim was shot or the location of the wounds. He did not see anyone else at the scene. He said that he did not recognize the Defendant and that he had not seen the Defendant at the victim's apartment.

On cross-examination, Mr. Beloch testified that he heard the gunshots around 2:00 p.m. He said he spoke with a detective who responded to the scene. He did not look at the victim's apartment after hearing the shots and did not notice if the victim's door was "busted open."

Memphis Police Detective Dewayne Smith testified that on April 8, 2008, he went to the hospital to show the victim a photograph lineup. He said the victim was in the intensive care unit and "barely" able to speak. He explained to the victim that the photographs were of six men with similar appearances and asked the victim if he could identify the man who shot him. He said that he did not suggest who the shooter was and that he told the victim that the shooter may not have been in the photographs. He said the victim immediately pointed to a photograph and said he was certain it was the man who shot him. The victim circled the photograph, initialed it, and wrote a brief explanation of what the man did to him. The

photograph lineup was admitted into evidence. On cross-examination, Detective Smith testified that he did not obtain a written statement from the victim but that the victim made a brief verbal statement.

The victim testified that in March 2008, he lived in an apartment on Corning Avenue with his girlfriend, Amanda Stone, and his two daughters. Ms. Stone was the mother of one of his daughters, and they had lived together for about two years. He said that they shared a key to their apartment and that on March 10 or 11, he and Ms. Stone accidentally locked the key in the apartment. He said he kicked open the back door to get into the apartment. The hinge on the door broke when he kicked it, and he nailed the hinge back into the wall. He said Ms. Stone was the only person present when he kicked open the door.

The victim testified that he and Ms. Stone argued a few days before the shooting and that he left the apartment. He lived with his family for a few days but returned to the apartment around noon on March 14 to gather his belongings from the apartment. He went to the apartment with a friend, Cedric Hall. He said that he went to the home at noon because he knew Ms. Stone would be at work but that Ms. Stone had the only key to the apartment with her. He said that he was able to gain entry by manipulating the lock that he attempted to repair a few days earlier and that he did not kick open the door. Mr. Hall stood behind him as he entered the apartment.

The victim testified that the Defendant jumped off the couch as he entered and that he asked the Defendant who he was and why he was in the victim's apartment. He said the Defendant responded by asking who the victim was and why he was there. He told the Defendant that he lived at the apartment and the Defendant responded, "She don't want you here" and told the victim to leave. He explained to the Defendant that he would leave after he gathered his clothing, but the Defendant pointed a pistol at him, cocked the gun, and said, "Bro, you need to go on and roll." He said that he was not familiar with guns but that he thought the gun was silver with a black handle. He said that neither he nor Mr. Hall was armed and that he did not own a weapon. He threw his hands up and said, "I'm fixin' to go on and roll." He said Mr. Hall grabbed his shirt and stated that they should leave. He said that he began backing toward the door and that when the Defendant turned his head, he turned and ran.

The victim testified that he had just made it through the doorway when he heard two or three gunshots and felt a bullet enter his lower back just above his waistband. He said that he turned to look at the Defendant, that the Defendant raised the gun to fire it again, and that he ran toward a neighbor's apartment and dove off the porch. He said that his legs went numb when he hit the ground and that he could not move. He said the Defendant came out and fired shots at Mr. Hall as Mr. Hall ran, then turned his attention back to him. He said the

Defendant stood on the porch and shot him twice near his left knee and calf. He said that he threw his arms up and told the Defendant, "you got me; I'm down." He said that the Defendant shot him five more times, hitting him in his right leg. He said that he saw and heard a bone in his leg break and that the Defendant shot him in the back of the neck after he turned over and attempted to "play dead." He said that the Defendant ran back into the apartment and that neighbors and a maintenance man came toward him and told him not to move because he had been shot. He said that the attack lasted about three minutes and that the Defendant did not say anything during the attack.

The victim testified that he lost consciousness in the ambulance and that his next memory was waking in the hospital and seeing his legs covered in bandages. He was in the hospital for about two months and underwent skin grafts on his legs. He said that he underwent thirteen surgeries over the past two years and that he had additional procedures planned. He was in the intensive care unit for about one month before he was stabilized and able to have visitors. He said that a detective visited him in the hospital and that he understood everything the detective said. He identified a form shown to him by the detective which explained that he would be shown a photograph display containing persons with similar appearances, that a suspect may or may not be included in the photographs, and that he was not to identify anyone unless he was positive of the identification. He said that the detective explained the form to him and that he signed it on April 8, 2008. He said the detective did not give him hints or suggest which picture contained the shooter. He examined the photographs and quickly saw the man who shot him. He circled the photograph and wrote his initials and the date. He said he was positive of the identification. He identified clothing he wore on the day of the attack, photographs of the scene, and photographs of his injuries, and they were admitted as exhibits. He said that other than speeding tickets, his criminal record consisted of one conviction for misdemeanor marijuana possession and one conviction for driving with a suspended license.

On cross-examination, the victim testified that although Ms. Stone kept the key to their apartment, his name was on the lease and he owned some of the furniture in the apartment. He agreed he did not live in the apartment for three days before the shooting and said he had not returned to the apartment before the shooting. He said he saw Ms. Stone at the home of one of her friends on March 13, 2008, and returned to his cousin's home for the night. He left his cousin's home the next morning around 11:00 and arrived at his apartment with Mr. Hall around 11:30. He went during Ms. Stone's normal work hours to avoid a confrontation. He said that he tapped on the door before opening it because he was not sure if Ms. Stone was at work but acknowledged that he did not tell the police he tapped on the door. He did not notify Ms. Stone that he was going to the apartment. He agreed that the doors were locked and that he did not have a key, but he denied that he "busted" the door open. He agreed

officers asked him about the broken door hinge. He told the officers that he previously kicked the door open and that he "shimmied" his way into the apartment on the day of the shooting.

The victim testified that he was surprised when he entered his apartment and saw the Defendant but that he was not angry and did not threaten the Defendant. He said he knew it was possible that the Defendant was a guest of Ms. Stone. He raised his hands for the Defendant to see he did not have a gun. He denied that Mr. Hall had to tell him to leave. He agreed he was shot in the back first. The Defendant did not fire at him as he ran out of the apartment, but he heard more shots as he jumped over the porch railing. He agreed the Defendant fired at Mr. Hall and then turned toward him and shot him twice in the leg. He said the Defendant stood on the porch and continued shooting at him. He did not know what the Defendant did after the Defendant returned to the apartment.

On redirect examination, the victim testified that he had eleven entry wounds and seven exit wounds. He said his hands were in front of his body during the entire attack. He said he made no threatening statements or movements toward the Defendant.

Cedric Hall testified that he had known the victim for about two years at the time of the shooting. He said that on March 14, 2008, he drove the victim to the apartment the victim shared with Ms. Stone. He said the victim had sprained his ankle and was limping that day. He did not see how the victim opened the door because the victim opened it while he walked up the steps to the door. He stated that the victim walked into the apartment and that the Defendant stood up, pointed a gun at the victim, and said, "She don't want you here." He did not know the Defendant and had not seen the Defendant before that day. Neither he nor the victim had a weapon, and he told the victim they should leave. He said the victim did not threaten the Defendant. He said that he heard two gunshots and that he saw the victim get shot in the back as the victim turned to leave. He ran and hid behind his car, and the victim ran to the side of the building. He said he ran when Defendant came onto the porch and fired about eleven more shots. He said the Defendant fired in his direction and then turned back to the victim. He did not hear any additional shots after he ran. He ran to a Walgreens and asked a security guard to call 9-1-1.

Mr. Hall testified that he spoke with the police that night and told them what happened. He said the police told him that they were going to show him photographs that might contain the shooter and that he should identify the shooter only if he were sure of the identification. He said the police did not provide any suggestions. He told the police that he did not see the shooter in the photographs, but he circled a photograph and told the police that the man looked like the shooter. He said that the State showed him a second group of photographs the week of the trial and that he identified the shooter quickly. He said he was not given

suggestions as to which person to select. He identified the photographs and they were admitted into evidence.

On cross-examination, Mr. Hall testified that he did not remember if the police told him that he should make a mark on the photographs only if he was sure it was the shooter. He thought the police told him to look at the photographs and circle a photograph if he recognized the shooter. He agreed he attended a preliminary hearing where he saw the Defendant and was shown photographs of the Defendant. He denied that when he identified the Defendant in a photograph display the week of the trial, he based the identification on his seeing the Defendant at the preliminary hearing. He said he saw the Defendant shoot the victim.

Mr. Hall testified that the victim stayed at his house the night before the shooting and that he and the victim saw Ms. Stone and spoke with her on the telephone that night. He was not sure what time he and the victim left his house the next morning. He agreed the victim told him that the victim broke up with Ms. Stone and that the victim was returning to the apartment to gather his belongings. He agreed he thought the victim was gathering his belongings to move out of the apartment. He did not know the condition of the door when they arrived but agreed the door was open. He did not see the victim make any movements toward the Defendant or hear the victim say anything to the Defendant. He said the victim did not raise his hands or point at the Defendant. He said that he told the victim they should leave and that the victim was shot when they turned to leave.

Mr. Hall testified that he spoke with the police on March 14, 2008, and signed a statement. He agreed that the events were fresh in his mind when he spoke with the police that day and that in the statement, he said the victim was shot in the ankle as they turned to leave the apartment. He agreed he reviewed the statement and was told to initial each page and sign it if the statement was accurate. He agreed he could have changed the statement if it contained errors. He agreed he thought the Defendant fired two shots in the apartment and eleven shots while on the porch. He said he hid behind his car until the Defendant stopped shooting and then ran. He stated that he did not see the Defendant leave the scene and that the entire incident did not last long.

On redirect examination, Mr. Hall testified that he stood behind the victim before the shots were fired, that he could see the victim's hands, and that the victim did not have a gun. He said the Defendant's pistol was large and black. He said that when he saw the Defendant at a preliminary hearing, he recognized the Defendant as the shooter. No one told him the Defendant was the shooter. On recross-examination, Mr. Hall testified that he thought the Defendant fired at him twice.

Nancy Bergeron testified that she owned a floral business and that she heard gunshots while she was arranging flowers on March 14, 2008. She said that she looked out a window and saw a man shooting at another man who was running away from the apartments behind her business. She called 9-1-1. She identified a photograph of the victim's apartment and said it was where she saw the shooter. She heard more than six shots but did not know the precise number. She only saw the shooter with a weapon. She could not see the person being shot at because the person was on the ground at the base of the apartment steps and out of sight. She stated that the shooter was an African-American male of medium height who was thin and "gaunt-looking" but that she did not get a good look at his face due to the distance between the apartments and her business. She said that the shooter returned to the apartment and that she saw him change his shirt as he left the apartment. She said she told the 9-1-1 operator that the shooter changed into a sleeveless t-shirt as he left. She watched the shooter walk down the street and told the 9-1-1 operator that the shooter was heading south on Kensett Street. She stated that the Defendant had a similar build to the shooter but that she was not sure if he was the shooter.

On cross-examination, Ms. Bergeron testified that her business was about 250 feet from the apartments. She said she gave a written statement to the police on March 17, 2008. She said that she was shown her statement and that she signed it. She agreed that after she heard several gunshots, she looked out the window and saw the shooter standing in the doorway of the apartment. She agreed that in her statement, she said she heard three or four shots fired in the apartment and then saw the shooter fire six more shots as he stood in the doorway. She said she thought she heard the shooter fire additional shots but acknowledged that she did not tell the police she heard any additional shots. She said it was possible that she left the information out of her statement but agreed the information in the statement was what she recalled at the time.

On redirect examination, Ms. Bergeron testified that the description of the shooter she gave in her statement to the police matched the description she gave earlier in her testimony. She said her testimony was based on her memory of the shooting, not her statement to the police.

Memphis Police Detective Stephen Roach testified that he met with Mr. Hall on the day of the shooting to show Mr. Hall a photograph display. He gave Mr. Hall a form explaining that the photographs contained persons of similar appearance, that the suspect might or might not be in the photographs, and that the police would not provide any suggestions on the identity of the suspect. He said Mr. Hall stated that he understood the form. He said Mr. Hall stated that one of the photographs looked like the shooter but was not the shooter. A photograph of the Defendant was not included in the display. He did not know if Mr. Hall viewed additional photographs at a later date. On cross-examination, Detective

Roach testified that although he spoke with witnesses, he did not take any formal written statements.

Memphis Police Officer Roger Wheeler testified that he went to the scene on March 14, 2008, that medical personnel were gone when he arrived, and that he did not speak with the victim. He said that officers had secured the scene when he arrived and that he found numerous shell casings, bullet fragments, a bullet, and bloody clothing. He collected the evidence after taking photographs of the scene. He identified photographs of the scene and the photographs were admitted into evidence. He identified cigarette butts, bullet fragments, a bullet, and ten shell casings from the scene, and the items were admitted into evidence. He said each of the shell casings were for nine millimeter ammunition. He said the door appeared to have been kicked open because molding was ripped from the wall. He said that the door looked as if it had been kicked in that day but that it was possible the door was kicked in a couple of days earlier. He did not examine the door for footprints, and the police did not recover fingerprints or footprints from the scene. He said he did not examine the opposite side of the apartment building because all of the evidence seemed to be in front of the building.

On cross-examination, Officer Wheeler testified that he found ten shell casings, which indicated to him that ten rounds were fired. He said he found two shell casings in the apartment and the remainder outside. He agreed he searched the scene carefully. He agreed he found a live round of ammunition on the apartment floor and that he did not know how it got there. He agreed that different guns could shoot nine millimeter ammunition and that he did not know what type of gun fired the shells found at the scene. He said he found three bullet fragments and agreed he did not know if the fragments hit anyone. He agreed that he saw four bullet holes in the air conditioner in front of the apartment and that he did not know when the air conditioner was shot or if it was shot with nine millimeter ammunition.

Officer Wheeler identified a photograph of the apartment door and testified that the hinges were off the door and a part of the lock was on the floor when he arrived at the scene. He did not ask what happened to the door and no one at the scene told him. He was not asked to collect fingerprints at the scene. The victim was not at the scene when he arrived.

On redirect examination, Officer Wheeler testified that he did not know how the door lock fell on the floor. He did not know if any of the bullets hit the door frame or split the wood around the frame. He agreed that he found ten shell casings but that it was possible he missed something at the scene. He agreed that at least ten shots were fired. He did not know if a detective examined the door for a footprint, and he did not see a footprint on the door. On recross-examination, Officer Wheeler testified that he did not see anything indicating that

-8-

a bullet struck the door. He agreed the door could have been forced open by something other than a kick.

The Defendant testified that he did not know the victim. He said that he was at his cousin's house around 10:00 p.m. on March 13, 2008, and that he met Ms. Stone while he was at the home. Ms. Stone invited him to her apartment and drove him there. He said Ms. Stone had a key to the front door. He spent the night at the apartment and slept on the couch. He said Ms. Stone went to work the next morning and stated she would return in a couple of hours. He said that she left through the back door and that he locked the door behind her. He did not notice anything wrong with the door and agreed it was secured and fastened. He said the door closed "perfectly." He said that he made something to eat and that he was sitting on the couch when the backdoor burst open. He said the door panel came off and the lock fell to the floor.

The Defendant testified that he panicked and that he was afraid when he saw a "dark-skinned male" whom he had never seen before come through the door. He said the man who opened the door was followed by a second man. He said that he and the victim each asked the other what they were doing in the apartment and that the victim seemed angry. He said the victim frowned and used profanity. He said that he asked the victim to leave and that the victim said it was the victim's apartment. He told the victim, "Okay, you're saying this is your house, allow me to leave." He said that the victim responded, "No, better yet, wait right there; I have something for you," and that he thought the victim's response was a threat. He said the victim blocked the only way out of the apartment because the front door was locked. He said that he fired "a couple shots" at the victim's legs, that he fired the gun because he was trying to clear a passageway, and that he was not trying to hit anything. He said that the victim left through the open door and that he followed onto the porch to see if he "had a clearing to make it out of the house safe." He said he fired a couple more shots from his nine-millimeter pistol, but did not know how many he fired because he was afraid. He did not know if he emptied the pistol's magazine. He did not know what the victim did after the victim left the apartment because he was afraid and not paying attention to everything. He said that he did not intend to kill the victim and that he did not fire shots at anyone else.

The Defendant testified that he left "the scene of the crime" after "everything cleared out." He said that he walked to his aunt's house, which was three or four blocks away and that he threw the gun away. He surrendered to the police about two weeks later after learning there was a warrant for his arrest. He said he spoke about the case only with his mother and his cousin, Shakemia Russell, before surrendering.

On cross-examination, the Defendant agreed that he did not know the victim, Mr. Hall, or Mr. Beloch before the shooting. He said he knew Ms. Stone and agreed he met her through

Ms. Russell. He said that he did not know Ms. Stone well, that they were not dating, and that he had never spent the night at her apartment. He did not know that Ms. Stone lived with the victim or that she had a child with the victim, but he knew she had two daughters. He did not see photographs of Ms. Stone and the victim in her apartment. He said that before Ms. Stone arrived at his cousin's home on March 13, 2008, he and his cousin smoked marijuana, which was what they "always" did. He said he smoked marijuana the entire day. He agreed he was affiliated with a gang called "the rolling thirties."

The Defendant denied that he discussed the shooting with persons in jail but stated that he discussed things related to it. He agreed he told his mother that "everybody else" told him how to handle his case and that all he needed was his cousin to be his witness. He agreed he called Ms. Russell and told her he needed her as a witness, but he denied offering her money. He agreed he told his mother that he committed the crimes and that three men broke the door to the apartment, but he did not remember telling his mother that four men entered the apartment. He said he lied to his mother because he feared other inmates would overhear his conversation and use it against him. He said he told his mother that the victim stated, "I've got something for you." He denied threatening to kill his mother's boyfriend or his previous attorney. He agreed he threatened to kill the mother of his children but said the threat was a "figure of speech." He agreed he was often angry and upset.

The Defendant testified that he had owned the nine-millimeter pistol used to shoot the victim for about two or three months at the time of the shooting. He said that the gun was fully loaded and that he loaded it. He said he received the gun from his child's mother. He stated that he had fired the pistol and that he knew how much pressure it took to pull the trigger. He agreed the trigger needed to be pulled each time he wanted to fire a shot. He said he previously owned two revolvers and agreed he did not have a permit for any of the weapons. He said he threw the pistol in "some bushes or something" as he left the victim's apartment and walked to his aunt's home. He said that he did not tell his aunt what happened but that he told his mother and Ms. Russell. He agreed he told Ms. Russell that he fired three shots but denied telling her that men shot at him while he was in the victim's apartment.

The Defendant testified that he did not know how a live round of ammunition came out of his pistol but that it possibly came out while he fired the gun. He denied loading the pistol in the apartment, and agreed he lost count of how many times he fired the pistol. He said Ms. Stone did not say anything regarding his having a gun in her apartment. He said he shot at the victim's legs and did not remember shooting the victim in the back. He agreed he shot at the victim outside the apartment, but he said that he was not trying to hit the victim and that he was "shooting reckless." He did not know if he shot the victim more than once. He denied shooting the victim while the victim was on the ground or shooting the victim in the neck. He denied shooting until the pistol was out of bullets. He said the gun held twelve

bullets. He agreed that a live round was found in the apartment, that the police recovered ten shell casings, and that the victim said he was shot eleven times. He agreed that the victim was on the ground when he left and that he did not call for help. He agreed that he turned himself in to the police one month after the shooting and that he knew about the warrant for his arrest before he turned himself in. He agreed he did not call the police and tell them it was self-defense. He said that he did not immediately turn himself in because he knew he "done wrong – and . . . was probably going to have to do a little time" and that he wanted to spend some time with his newborn child. He agreed he planned to tell the jury that the shooting was in self-defense. He agreed that he did not see the victim or Mr. Hall holding a gun and that the victim claimed to live in the apartment. He said that he asked if he could leave the apartment but that he did not attempt to get by the victim before firing the pistol.

On redirect examination, the Defendant testified that he was afraid when the victim and Mr. Hall entered the apartment. He said that the door behind the victim was the only way to leave the apartment and that he fired the pistol to clear an exit, not to kill the victim. He wished the shooting did not happen and regretted it.

On recross-examination, the Defendant testified that he felt bad for the victim and denied that persons in jail suggested that he should express regret. He said he was not a violent person.

Amanda Stone testified that the victim was her boyfriend and the father of her child and that in March 2008, they lived together in an apartment on Corning Avenue in Memphis. She said that the victim's name was on the original lease but that she had to remove his name from the lease due to a dispute with the power company. She did not have a copy of the original lease. They shared one key to the apartment. She said that he left the house on March 12 after they had an argument but that they did not break up. She said that Shakemia Russell was her best friend and that they spent the day together on March 13. She said that while she and Ms. Russell drove, the victim followed behind them and attempted to call her cell phone. She did not speak with the victim because Ms. Russell answered the telephone. She said that the victim followed them to Ms. Russell's home and that he arrived about fifteen minutes after they did. She said the victim did not threaten to kill her that night. She said that she saw a group of men in the front yard have an altercation and that the police were called but that the victim left before she could go outside. She said that the police told her not to go home alone and that she drove the Defendant to her apartment.

Ms. Stone testified that she entered the apartment through the front door and that she used her key to enter. She said the front door could be unlocked from the inside without a key. She said the back door had to be repaired previously after she locked her key in the

-11-

apartment and asked the victim to retrieve it. She waited in the car and did not see how the victim opened the door. The door was repaired by nailing a part of it to the door frame.

Ms. Stone testified that she was late for work the next morning and left the Defendant in her apartment. She told him she would return around 2:00 p.m. and give him a ride home if he was unable to find a ride before she returned. She received a telephone call at work and was told that the victim had been shot. She stated that she returned home and that the back door appeared to have been forced open. She assumed the victim was the person who opened the back door. She spoke with the police and provided a statement. She did not remember if she told the police that the victim would not have been shot if he had not kicked the door in or that she and the victim fought and he pushed her, grabbed her by the throat, slapped her, threw things at her, and broke her telephone when she attempted to call the police. She said the police questioned her and made her feel like they would arrest her if she did not tell them "what they wanted to hear." She said that the victim never fought physically with her and that he "always walked away before it got to that point." She said she loved the victim and was not afraid of him. She did not recall telling the police that the victim fought physically with her.

On cross-examination, Ms. Stone testified that she normally kept the key to the apartment but would give the key to the victim when she left for work. She said pictures of the victim were present in the apartment when the Defendant came to the apartment. She stated that she saw the Defendant's gun as she drove him to her apartment and that he said he took it everywhere he went. She said that she should have turned around and taken the Defendant back to the home from which they came but that she was tired and wanted to get to her apartment. She said that she did not feel comfortable leaving the Defendant alone in her apartment when she left for work the next morning but that she was late for work and did not have time to drive him home. She agreed her front door could be opened from the inside without a key. She agreed her and the victim's names were on the original lease. She agreed that she locked her key in the apartment shortly before the shooting, that the victim repaired the door, and that his repair work was shoddy.

Ms. Stone testified that Ms. Russell did not like the victim and that Ms. Russell called the police after an altercation occurred in front of her home on March 13, 2008. She did not know what caused the altercation. She stated that the victim would leave when they argued and that he never physically harmed her. She said the victim never moved out of the apartment permanently. The victim did not own a gun and did not like guns. She said the victim was a loving man and not violent. She said that when she spoke with the police after the shooting, she was handcuffed to a chair and read her rights. She felt like a suspect and worried that the police would try to take her children from her.

-12-

On redirect examination, Ms. Stone testified that she did not know when the victim would return to their apartment but that she did not want the Defendant to leave when she left for work because she was not going to leave him "stranded." She agreed the victim came to Ms. Russell's home on March 13, 2008, to retrieve a stereo faceplate. She did not give the victim the faceplate and did not know if he was angry about being unable to retrieve it. She remembered telling the police that the victim slapped her and grabbed her by the throat, but she said the incident was weeks before the shooting. She stated that the altercation did not occur and that she lied to the police because they made her "feel that if I didn't tell them what they wanted to hear so that they could see the scenario how they wanted to see it, that they were going to arrest me, charge me, and take me away from my children." She said the police called her a liar and threatened to put her in jail if she did not sign her statement.

On recross-examination, Ms. Stone testified that none of the violence she mentioned to the police happened. She said that Ms. Russell was her best friend and that Ms. Russell's mother, who was the Defendant's aunt, lived less than one block from her and the victim's apartment. On further redirect examination, Ms. Stone testified that when she left for work, she did not take the Defendant to his aunt's home because that was not her "focus" when she awoke on March 14, 2008.

Shakemia Russell testified that she and Ms. Stone were co-workers and good friends and that they were together on the night of March 13, 2008. She said that they stopped by Ms. Stone's apartment and that she normally would not go to Ms. Stone's apartment because Ms. Stone and the victim "always had altercations and fights . . . I wasn't gonna come over her house as long as he was there." She said she previously saw the victim grab Ms. Stone by her hair. She went to Ms. Stone's apartment on March 13 because the victim left the apartment and had not returned for a couple of days. They drove to her home after leaving Ms. Stone's apartment. She stated that they encountered the victim as they drove to her home and that the victim sped up beside them and tried to run them off the road twice. She said that the victim spoke with Ms. Stone using a speaker phone and that she heard the victim threaten Ms. Stone and say he was going to come to Ms. Russell's home and beat them up. The victim arrived at the home about five minutes after she and Ms. Stone did. She said the victim was upset, jumped on a car, and yelled to Ms. Stone to come out of the house. She stated that she confronted the victim and told him he could not come in her home but that he attempted to "run through" her into the home. She said that she pushed the victim away and that the victim fought with her neighbor in the street. The police arrived a short time later and she told them what happened. She said that Ms. Stone was "shaken up" and was concerned about returning to her apartment.

On cross-examination, Ms. Russell testified that the Defendant was her cousin and that although they were close, they would not see each other for "a couple years at a time." Her

father, who was the Defendant's uncle, lived near Ms. Stone, and the Defendant had been to his uncle's home previously and knew where it was. She agreed the Defendant called her from jail and told her he needed her help as a witness. She agreed she received "a lot of pressure" from the Defendant's family to testify. She said she wanted to help the Defendant.

Ms. Russell testified that she did not like the victim. She said her husband was incarcerated but denied that she was lonely or that she was upset because Ms. Stone spent a lot of time with the victim. She agreed that after her husband was incarcerated, she spent a lot of time with Ms. Stone. She did not call the police when she saw the victim grab Ms. Stone's hair, but she told Ms. Stone to "get help." She said that the police were never called in response to the altercations between Ms. Stone and the victim, other than on March 13, 2008, and that Ms. Stone never went to the hospital. She stated that the victim never hurt her and that she did not know if he hurt anyone else. She did not file a police report or press charges when the victim attempted to drive her off the road.

Ms. Russell testified that the Defendant came to her home after the shooting and told her that two people shot at him through a door and that he shot the "guy who broke in the door" three to five times. She remembered speaking with the police on March 14, 2008, and providing a statement. She reviewed the statement and initialed it. She did not know if she told the police that the victim threatened to beat her and Ms. Stone on March 13, but she agreed it would have been important to provide the information. She agreed she told the police she saw the Defendant carry a "big, black, square gun." She never saw the victim with a gun.

On redirect examination, Ms. Russell testified that the Defendant did not tell her to lie. She said she told the police that the victim attempted to run her off the road, that he tried to enter her home, and that he fought in front of her home. She did not tell the police the victim threatened to kill her. On recross-examination, Ms. Russell testified that she did not know if the Defendant got angry and fought frequently.

On rebuttal, Juana Boyland, the victim's mother, testified that she raised the victim to be a "respectful young man" and that they were close. She said the victim was "mild-mannered" and walked away from conflict. She never saw the victim lose control or fight. She never saw the victim react physically to Ms. Stone. She said that he lived with her when he got out of the hospital and that she, the victim's aunt, and the mother of the victim's other child assisted in his recovery.

On cross-examination, Ms. Boyland testified that although she saw the victim get angry, she never saw him fight. She said the victim lived with Ms. Stone around March 14, 2008. She said neither the victim nor Ms. Stone spoke of any problems or fighting. She said

Ms. Stone was not around while the victim recuperated after the shooting. She agreed she did not know what the victim did while he was away from her home.

Officer Wheeler testified that he searched the victim's car at the scene and that he did not find a weapon. He did not find a weapon in the home or in the yard. On cross-examination, Officer Wheeler testified that it was possible a weapon was removed before he got to the scene.

The victim testified that on March 13, 2008, Ms. Stone took keys and a radio faceplate belonging to his friend. He said that he called her and told her he needed the items and that he did not threaten her or Ms. Russell. He said that he did not threaten Ms. Russell at her home but that he felt threatened because three men were in her yard and one of them told him to "hold on." He agreed there was a fight but said he did not start it. He said he did not have a weapon when he went to his apartment the next day. He said that the Defendant never asked to leave the apartment and that he did not tell the Defendant, "Wait right there, I got something for you." He said he saw the Defendant's gun and attempted to leave.

On cross-examination, the victim agreed he spoke with Ms. Stone on the telephone on March 13, 2008. He said that Ms. Stone would not speak to him and that he spoke to Ms. Russell. He agreed he fought in front of Ms. Russell's home and said it was not the first time he had been in a fight. He said he fought two or three times in elementary school and high school and once when he was in the Army. He stated that he did not try to run Ms. Russell off the road and that he was "trying to see why they wouldn't stop."

On redirect examination, the victim testified that he never threw the first punch in his fights and that he was not an aggressive person. He said that he had never harmed a woman physically and that he would never do so because it was wrong and because his mother would "kill" him.

The jury found the Defendant guilty of attempt to commit second degree murder, employing a firearm during the commission of a felony, and two counts of aggravated assault. The trial court merged the aggravated assault convictions into the attempted second degree murder conviction and ordered the Defendant to serve an effective eighteen-year sentence. The Defendant appealed his convictions but only raises issues related to the attempted second degree murder.

**I**

The Defendant contends that the evidence is insufficient to support his conviction for attempt to commit second degree murder because it did not establish that he intended to kill the victim or that he acted without adequate provocation. The State contends that the evidence is sufficient to support the Defendant's conviction. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As pertinent to this appeal, second degree murder is a knowing killing of another. T.C.A. § 39-13-210(a)(1) (2010). With regard to criminal attempt:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> . . .
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a)(2)-(3) (2010). A person acts knowingly with respect to his conduct or to circumstances surrounding his conduct when the person is aware of the nature of the conduct or that the circumstances exist. Id. § 39-11-106(a)(20) (2010). A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Id.

Taken in the light most favorable to the State, the record reflects that the Defendant intentionally and repeatedly shot at the victim after speaking with the victim, being told that the victim lived in the apartment, and seeing that the victim and Mr. Hall were unarmed. The Defendant claimed that he fired the gun at the victim because the front door was locked, that the victim blocked the back door, and that he wanted to clear a passageway from the apartment. He admitted, though, that he did not attempt to get by the victim before firing the pistol. The Defendant followed the injured victim outside as he fled and shot the victim multiple times when the victim was on the ground. The Defendant shot the victim in the neck when the victim pretended to be dead.

Mr. Beloch testified that he lived above the victim and that on March 14, he did not hear a door being kicked in or any other indication of a disturbance before he heard the gunshots. The victim testified that the Defendant jumped off the couch as he entered and that each asked what the other was doing in the apartment. The victim told the Defendant that he lived in the apartment and the Defendant responded, "She don't want you here" and told the victim to leave. The victim explained to the Defendant that he would leave after he gathered his clothing, but the Defendant pointed a pistol at him, cocked it, and said, "Bro, you need to go on and roll." The victim said he did not make threatening statements or movements toward the Defendant. The victim said that he attempted to leave and that he had just made it through the doorway when he heard two or three gunshots and felt a bullet enter his lower back just above his waistband. Mr. Hall testified that the victim walked into the home and that the Defendant stood up, pointed a gun at the victim, and said, "She don't want you here." He said that neither he nor the victim had a weapon and that the victim did not threaten the Defendant. He said the victim did not raise his hands or point at the Defendant. He heard two gunshots and saw the victim get shot in the back as the victim turned to leave. The Defendant testified that he did not see the victim or Mr. Hall holding a gun and that the victim stated that he lived in the apartment. He said he fired shots at the victim because the front door was locked and the victim blocked the only way out of the apartment.

The victim testified that the Defendant chased him out of the apartment and shot him twice near his left knee and calf. He said that he threw his arms up and told the Defendant, "you got me; I'm down." While the victim was on the ground, the Defendant shot him five more times, hitting him in his right leg. He said that the Defendant shot him in the back of the neck after he turned over and attempted to play dead. He said he had eleven entry wounds. Mr. Hall said he ran and hid behind his car when the Defendant began firing shots. He said the Defendant came out to the porch and fired about eleven more shots. The Defendant testified that he lost count of how many times he fired the pistol at the victim and that he was "shooting reckless."

We conclude that a rational trier of fact could have found the elements of attempt to commit second degree murder beyond a reasonable doubt.  We hold that the evidence is sufficient to support the Defendant's conviction.

We must note, though, that despite the trial court's merging the two convictions for aggravated assault into the Defendant's conviction for attempted second degree murder, the record improperly contains separate judgments and sentences for the aggravated assault convictions.  There should not be separate judgments listing sentences for the merged convictions.  Noting merger in the special conditions portion of the judgments does not suffice.  The case must be remanded for entry of a judgment reflecting that the convictions for aggravated assault have been merged into the attempted second degree murder conviction.

In consideration of the foregoing and the record as a whole, the Defendant's convictions are affirmed, but the aggravated assault and attempted second degree murder judgments are vacated and the case is remanded to the Shelby County Criminal Court for entry of a corrected judgment.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE